2d. That the lessor of the plaintiff demanded the rent on the day on which it became due in virtue of the lease by *Charles Ridgely,* son of *John,* to *George Lindenberger,* on the 5th of August 1780.

3d. That the lessor of the plaintiff's demand of the rent was for the exact sum due for the rent.

*Cooke,* for the plaintiff.

*Martin,* (Attorney General,) for the defendants.

The point was waived by the attorney general, and judgment was entered for the plaintiff for possession, and costs.

## COURT OF APPEALS, JUNE TERM, 1798.

### C. DORSEY's EX'RS. *vs.* E. DORSEY's ADMR. D. B N. &c.

APPEAL from the Court of Chancery. It appears that *Edward* and *Caleb Dorsey* were *joint tenants* in carrying on a plantation called *Chew's Resolution Manor,* which they *stocked at their joint expense,* and the profits of which *they equally divided;* they were also concerned in iron works, in company with *Alexander Lawson,* as tenants in common, each partner one third. *Edward Dorsey* died in 1760, having first made his will, wherein he devised his estate, both real and personal, to his two daughters, and in the event of their death, without issue, and before their arrival at age, he limited over the lands held in company with *C. Dorsey* and *A. Lawson, together with his share of the personal stock held in iron works,* to *C. Dorsey* and his heirs, forever. As to the personal estate, he bequeathed as follows: That in case of his children's death as aforesaid, *"that then all the personal estate, that shall by this my will belong to the surviving child, shall be equally divided* among" sundry of his relations, excluding *C. Dorsey.* The testator also, by his will, put his estate under the care of his executor and trustee, *to be managed* for the *use and benefit* of his children, till they should arrive at age; and if the *trustee should have at any time more money* by him than *was sufficient for their support,* and for the *disbursements* directed, he was to lend it out on good security for the benefit of his children. On the death of *E. Dorsey one moiety* of the personal property on the farm was appraised as *E. Dorsey's* estate, with the approbation and consent of *C Dorsey;* and the administratrix with the will annexed of *E. Dorsey,* drew the profits of it for six years, till the death of the surviving child in 1766, when *C. Dorsey* claimed the same *as survivor of*

JUNE 1798.

C. Dorsey
vs.
E. Dorsey.

his brother *E. Dorsey*, on an event which happened six years before.

From the year 1760 to 1766, large quantities of pig iron and castings were made, *as annual profits*, at the Elk-Ridge Furnace, which were divided *yearly in thirds*; one third of which belonged to the daughter of *E. Dorsey*, and had been in great part delivered.

On the death of the surviving child, which happened in 1766, there was the quantity of 297 tons of pig iron *remaining of her one third part of profits, unaccounted for*, and which *C. Dorsey converted to his own use, and for which he refused even to render any account*.

In January 1767, a bill was filed in the court of chancery by the administrators *de bonis non* of *E. Dorsey*, and administrators of his daughter *Henrietta Maria Dorsey*, for an *account of the moiety of the stock on the farm, and for one third of the pig iron and castings* made after *E. Dorsey's* death. To this bill the defendant *C. Dorsey*, refused to make any discovery, or even answer, alleging in his plea, that the farm, which was carried on at Elk-Ridge jointly by him and *E. Dorsey*, was limited and settled on him in virtue of a deed from his father, on the event of his brother *E. Dorsey* dying without issue. This deed was dated the 25th of March 1732, between *C. Dorsey* the elder, of the one part, and *John Beale*, (deceased,) trustee for the several sons of the said *C. Dorsey*, whereby the said land was conveyed to the said *Beale* in trust, "to, and for the use and behoof of, *Samuel Dorsey*, son of the said *C. Dorsey*, for and during the term of his natural life, and from and after his death then to the use and behoof of the heirs of the body of the said *S. Dorsey*, lawfully to be begotten; and for want of such issue, then to the use and behoof of *Joshua Dorsey*, another son of the said *C. Dorsey*, and to his heirs lawfully to be begotten; and for want of such issue, then to the use and behoof of *Caleb Dorsey*, junior, and *Edward Dorsey*, two other sons of the said *C. Dorsey*, and their heirs lawfully to be begotten, to be equally divided between them, and their heirs lawfully to be begotten; and for want of such issue then to the use and behoof of the right heirs of the said *C. Dorsey* forever." It is stated, that *S.* and *J. Dorsey* both dead without issue, and that the said lands became the right and estate of the said *C. Dorsey* and *E. Dorsey*, as joint tenants in tail in remainder. That the said *E. Dorsey* being since dead without issue, on that event taking place, "the plantation aforesaid became the sole property of the said *C. Dorsey* by survivorship, together with all the white servants, negroes, and other personal property therein being;" and also contending as to the pig iron and castings, "*that the same became the sole pro-*

*perty of the said C. Dorsey under the will of the said E. Dorsey.*"

In October 1773, the surviving administrator *de bonis non* of *E. Dorsey*, and surviving administrator of his daughter *H. M. Dorsey*, suggested the death of *C. Dorsey*, and filed a bill of revivor against his executors; and in May 1790, they put in their answer. In this answer, and the exhibits referred to, it appears that *the moiety* of the stock on the farm amounted to 377*l.* 18*s.* 0*d,* and the balance of pig iron to 2481*l.* 7*s.* 10*d,* which was charged at 5*l.* sterling per ton.

In May 1794, the death of the surviving administrator, &c. was suggested, and a bill of revivor filed by *Deborah Dorsey*, as administratrix *de bonis non* of *E. Dorsey* and *H. M. Dorsey*, against the executors of *C. Dorsey*, who put in their answer at December term 1794.

Hanson, Chancellor, at May term 1795, viz. on the 15th June 1795, by *agreement of the parties* decreed—"that the defendants account with the complainant for one moiety of the personal stock which was at Patuxent Quarter on the 15th of October 1766, and also for one third part of the annual profits arising from the Elk Ridge Furnace from the death of *E. Dorsey* in the year 1760, to the death of *H. M. Dorsey* in 1766; also for one moiety of all profits arising from Patuxent Quarter, from the death of *E. Dorsey* to the death of *H. M. Dorsey*, so far as the same came to the possession of the said *C. Dorsey*, and were not accounted for by him as guardian of the said *H. M. Dorsey*," &c. "provided nevertheless, conformably to the said agreement, that this decree shall not be considered as an admission of the defendants, or an adjudication of the court, that the complainant is entitled to the said moieties and third part during the intervals of time aforesaid, or for any intervals of time aforesaid, or for any other interval of time, but that the decision respecting her right, and all equity, be reserved to final hearing."

At October term, 1795, the auditor made his report, stating the sum of 5784*l.* 5*s.* 1*d,* including interest to the 1st of September 1795, to be due from the defendants to the complainant.

Hanson, Chancellor, at February term, 1796, stated —"that the equity reserved in this cause by the decree passed at May term (on the 15th of June) last, being submitted to him, he has considered the same, and is of opinion that the complainant is entitled to an account as by that decree directed to be stated."

There being no exceptions filed to the auditor's report, although motion and order, &c. the chancellor decreed that the said report, and the account stated by the auditor, be absolutely ratified and confirmed; and that the defendants bring in or pay to the complainant the said sum of 5784*l.* 5*s.* 1*d,* with interest from the 1st of September 1795 until paid.

From this decree the defendants appealed to the Court of Appeals.

*S. Johnston* and *Key,* for the appellants, relied upon the deed from *C. Dorsey* to *J. Beale* in 1732, and that the land survived to *C. Dorsey* under that deed; also upon the will of *E. Dorsey,* as bequeathing to *C. Dorsey,* in the event of the death of his children, the iron works, stock, &c. They also contended, that although no exceptions had been taken to the auditor's report, and the decree was made thereon, if it manifestly appeared to the court of appeals that the charges were unjust—that the proper credits had not been given, or that for any other reasons the decree ought to be rectified in part, or wholly set aside, it was the usual practice for the court of appeals so to do—and cited 1 *Brown's Parl. Ca.* 202 *to* 209. 2 *Bro. Parl. Ca.* 59. 3 *Bro. Parl. Ca.* 87, 194, 513.

They stated sundry supposed errors in the auditor's report, and contended that the decree of the chancellor ought to be reversed.

*Ridgely,* for the appellee—Two questions arise on the bill and answer, which the appellants rely on, and if either of them be determined in favour of the appellee, there must be a decree to account in this case.

*First question*—Whether, in virtue of *the deed* from *Caleb Dorsey* to *John Beale* in 1732, which limits *Chew's Resolution Manor* to *C. Dorsey* his son, on the contingencies therein happening, *the negroes, stock,* &c. on the said plantation, which was held as *joint property,* and was *furnished* by *E. Dorsey* and *C. Dorsey* many years after the deed, *survived also* with the land to the appellants' testator *C. Dorsey, under the said deed?*

The appellants rely on the rule of *survivorship* among *joint tenants* to justify their testator in converting the whole personal property on the plantation *to his own use.*

It is admitted by both parties that this plantation was *joint property;* that it was *stocked* at *joint* expense; *carried* on for *joint profit;* and that *C. Dorsey* survived his brother *E. Dorsey.*

To make the *personal* property on the farm *survive* in favour of the appellants' testator, one of *two* things must be established to the satisfaction of the court—either that

the *personal property* was *annexed* to and *vested with the* freehold under the limitations in the deed of 1732, or that *stock* on a *farm*, or stock used in other *joint undertakings*, by way of partnership for *mutual profit*, is subject to the rules of *survivorship*, as other *joint tenancies*.

I cannot persuade myself that it will be contended *seriously*, that the *stock on this farm* was subject to the *same limitations* as the *farm itself*, by the deed of 1732.

First, because the deed of 1732 says not a word of *personal property*; yet the appellants in their answer, say that *C. Dorsey* is entitled to the *whole stock and profits* by *survivorship*, by *virtue of the said deed.*

Secondly, because by the rules of law, too well established to admit a contradiction, *real property descends to heirs*, and *personal property vests in executors.*

Authorities surely need not be produced to establish this doctrine—it is too obvious to be denied.

Let us then see whether the appellants can support the position, that *stock* on a farm *held by two persons jointly* for *mutual advantage* will wholly belong to *the survivor* in *exclusion of the representatives of the deceased.* This doctrine is so *unjust* in its *operation*, would prove so *injurious* to creditors and others, and is so prejudicial to industry and commerce, that the contrary has been universally admitted.—For this, see 1 *Vern.* 217. 1 *Eq. Ab.* 370. 3 *Bac. Ab.* 192. *Co. Litt.* 182. 2 *Blk. Com.* 399. 2. *Vern.* 430. 1 *P. Wms.* 34. 3 *P. Wms.* 158, 159. 2 *Ves.* 258.

The plea of survivorship was overruled by the chancellor under the proprietary government, on solemn argument, which will appear by the records in this cause *(a)*; and the then defendant *C. Dorsey* was ruled to answer the allegations in the bill. That this was the opinion of the appellants' testator himself, after the death of *E. Dorsey his partner*, appears by his allowing the *administratrix* and *guardian* of his brother's daughter to take and receive *half the profits* till her death for the term of six years.

This personal property on the farm *not vesting* in *C. Dorsey*, deceased, as the land did, and *being appraised in E. Dorsey's* estate, and delivered to the *guardian* of *E. Dorsey's* child, on her death became subject to the dispositions thereof made by the will of *E. Dorsey*; and the appellee, as administratrix of *E. Dorsey* and *his daughter*, is entitled *to an account of the same with interest.*

The *second point* relied on by the appellants is, that by the will of *E. Dorsey*, the lands held in common with *C. Dorsey* and *A. Lawson*, if his children should die, should go to *C. Dorsey* and his heirs, together *with all his share of personal stock* in iron works.

June 1798.

C. Dorsey
vs.
E. Dorsey.

*(a)* It is not so stated in the transcript; the omission was owing probably to an oversight in the register.

June 1798.

C. Dorsey
vs.
E. Dorsey.

I admit, that under the will of *E. Dorsey*, his brother *C. Dorsey* became entitled to the *personal stock* belonging to *E. Dorsey*, but not to the *annual profits* of the same from the time of *E. Dorsey's* death to that of his daughter, nor to the increase thereof.

By the will of *E Dorsey* we find that the profits of his daughters was to be carried to the credit of his children, and *applied for their maintenance by his executors.*

The profits therefore became the estate of *the child,* and were not disposed of by *E. Dorsey's* will. 2 *P. Wms.* 419. 1 *Bro. Cases in Cha.* 82.

If *E. Dorsey* had intended the profits of the *iron works* for *C. Dorsey,* in case of his daughter's death, he would have so directed in his will.

But, say the appellants, *pig iron* and *castings*, at the end of the year when a settlement took place, was entered into a book of *account of stock.* I answer, it was not *"personal stock,"* such as *E. Dorsey's* will contemplated. But suppose this to be the case, yet the *annual profits* made were never intended by the testator, *E. Dorsey,* to pass by *the devise* to *C. Dorsey,* they were disposed of in another manner. What are the words of the will? *"All his share of personal stock,"* which obviously mean the negroes, teams, &c. *necessary* and *used* for carrying on iron works; not the *increase* or *profits* acquired after the testator's death. Besides, *C. Dorsey* in this case was *manager,* and *trustee* or *bailiff* for the child of *E. Dorsey,* and his possession of the *pig iron* and *castings* must in equity be considered as the *possession of the child.*

What do the articles of copartnership say? "That all pig iron to be annually carried to Elk Ridge Landing and there divided."

Is the appellants' testator, *C. Dorsey,* to take advantage of *his own wrong* by not delivering and dividing the *pig iron pursuant to agreement,* and then convert the same to his own use under this clause of the will, on the event of *E. Dorsey's* child dying? Suppose *C. Dorsey,* who was *manager,* had never delivered a single ton of iron after *E. Dorsey's* death, would he be permitted to take advantage of the *violation of the articles of agreement* and *sweep away all the profits* under the *name of stock?*

What do the articles of copartnership stipulate? That *annual accounts* and *annual* divisions of *pig iron* should be made.

Do the articles give any power to the partners to divide the *personal stock?* No—Yet if the appellants' doctrine was to prevail, the *stock* might be divided every year. What is the true construction of the copartnership agreement, and what is the true intent of the devise of *E. Dorsey's* will?

That every kind of *personal* property necessary to carry on iron works should be deemed *personal stock*, and as such was annexed to the works, and intended to pass by the will of *E. Dorsey.* He could not suppose that the pig iron would not be divided according to *articles,* and he could not have had it in contemplation *in his will.* If he had, he would have mentioned *pig iron, outstanding debts,* &c.

Upon the whole, nothing appears better ascertained by the rules of law, than that no *survivorship* takes place *of the stock on a farm.* That the deed of 1732, which contained only a disposition of real property, could *not affect personal property,* which was put on the *real property* upwards of 20 years after its date. That under the will of *E. Dorsey,* the *pig iron,* &c. made after his death, *did not pass,* but must be considered as part of the daughter's personal estate, and to be accounted for to the appellee as administratrix.

*Winchester,* in reply. The decree appealed from in this cause was grounded on an account stated by the auditor of the court of chancery, in pursuance of an interlocutory decree of the 15th of June 1795.

The interlocutory decree passed *by consent,* under an express denial of any *right* in the complainant, and an unqualified reservation of *all equity,* until the final hearing on the part of the defendants.

The account stated by the auditor, in pursuance of the decree by consent, embraced three subjects:

1st. One moiety of the *personal stock* which was at Patuxent Quarter on the 15th of October 1766.

2d. One third of the annual profits arising from the Elk-Ridge Furnace, from *E. Dorsey's* death in 1760, to *H. M. Dorsey's* death in 1766.

3d. One moiety of all profits arising from Patuxent Quarter from *E. Dorsey's* death, (1760,) to *H. M. Dorsey's* death, (1766,) so far as they came to *C. Dorsey's* possession, and were by him unaccounted for to *H. M. Dorsey's* guardian.

The appellants controvert the right of *Edward Dorsey's* executor to an account either of the *personal* stock, or the profits of the Furnace or Patuxent Quarter. The decree of the chancellor passed without argument, and was a confirmation of the auditor's report as a matter of course, the appellants' counsel having omitted to take exceptions to the report, and also to have a hearing on the equity reserved.

They do not therefore consider that there is the weight of the chancellor's opinion against them, which they admit ought to be highly appreciated where given on deli-

beration and after argument; but the decree having passed agreeably to the practice of the court, without argument, all the questions in the cause may be considered as now first presented for investigation.

If the appellants had even acknowledged the right of the appellee to an account of the stock and the profits, &c. the report of the auditor, charging them *with interest*, is so manifestly repugnant to the rules of law, and the decisions of courts of equity, that the counsel of the appellee has not offered *one single reason* to justify it, or referred to a single decision or *dictum* for its support. This part of the case is without any difficulty. But that my ideas may be more clearly understood, I will consider the questions in the order in which they arise on the interlocutory decree.

1st. The stock at Patuxent Quarter. This question is (very incorrectly,) stated by the appellee's counsel as depending on the limitations in the deed of 1732 from *Dorsey* to *Beale*. The appellants do rely on the rule of survivorship among joint tenants, to support their right to this property, not on the ground that it is a right incidental to, or flowing from the deed of 1732, or its provisions, but as depending on a general rule of law, applicable to the facts in the case, which are only necessary to be examined to free the question from any complexity which will arise from connecting it with irrelevant matter. *Edward* and *Caleb Dorsey* were joint owners of the land called *Chew's Resolution Manor*, on which some personal estate was kept and employed for their *joint* benefit as *joint owners*, (unconnected with any trade,) and which had been purchased at their joint expense, and that by survivorship *Caleb* claimed the whole. On the fact, the question as to the legality of that claim arises.

The general rule of law, that survivorship holds among joint tenants of chattel interest, as well as of real estate, is incontestible. On the part of the appellee it will be necessary to shew that she is within the provision of exception limiting the operation of this general rule. The counsel for the appellee has not shewn any exception embracing her case, but has hastily adopted the authorities which destroy survivorship among *merchants*, without shewing, (indeed it is impossible to shew,) any analogy between such a case and the present. The reasons assigned for applying the maxim "*jus accrescendi inter mercatores locum nor habet*," to the case before the court, go with equal propriety to the destruction of *all joint tenancies*; for in all cases where the rule is admitted, the injustice of its operation is the same; the injury to creditors is the same; the prejudice to industry the same. These are reasons of *policy* which might have influence with the

*makers* of laws, but can have none in a court of justice, who only expound the law as they *find*, not make or *alter* it.

That survivorship takes place in every kind of chattel interest, except in case of merchants, see *Litt. sec.* 281, 282. *Co. Litt.* 181. *b.* 2 *Roll. Ab.* 87.

The exception in favour of merchants is not by the *general* common law, but *per legem mercatoriam*, for the advancement of *trade and commerce*—*Co. Litt.* 182. *b.* The pursuits of trade and commerce are notoriously as different from those of agriculture and husbandry as any subjects in nature. That an exception introduced in favour of trade and commerce cannot extend to farming in principle, terms or reason, it appears to be only necessary to resort to any dictionary of the English language, where the opposite nature of the cases will be fully illustrated by the very definition of the terms.

The case, 1 *Vern.* 117, which is relied on by the appellee's counsel, is very obscurely and imperfectly reported. So far as the question before the court can be collected from the case, it appears to have been one which related only "to stock employed in the way of trade," and depending on the custom of merchants, for the distinction is expressly taken between *joint tenants in trade*, and the other modes of acquisition and holding, such as the present case. It must be so explained, if the authority of the case is admitted; for, independent of this explanation, it is directly opposed to the principle of the decision in the same book, *(page 33,)* only two years before; and with it, it is reconcileable to the authority of *Littleton, Coke* and *Rolle*; and *Blackstone,* in adopting the case, and referring to it, only intends to apply the principle to stock in that kind of husbandry which depends on bargaining and selling; for instance, such as graziers, colliers, &c. and *not* in the ordinary cases of husbandry.

The appellants' testator always acted under this impression from the time he discovered his right to the property, and as appears by the answer and proofs, refused to sign an inventory or appraisement of it as part of his brother's estate; but even if he had, any such act being under *ignorance*, it could not affect his right; the law being clear, that a right to personal property can only be transferred by a formal *donation* or *written grant.*

2d Question. The appellants insist that the profits of Elk-Ridge Furnace, and the Patuxent Quarter, passed under the will of *Edward Dorsey* to *Caleb Dorsey,* and that therefore the appellee has no right to an account of such profits.

The authorities referred to by the appellee's counsel, 2 *P. Wms.* 419. 1 *Bro. C. C.* 82—establish the general position, that on a devise of personal estate to an infant, payable

at 21, and a limitation over for default of issue, or a dying before that period, that the interest or profits of the intermediate time shall go to the infant. I admit the law to be clearly according to these two decisions; but I insist that they apply *only* to the case where the testator has been silent as to the intermediate interest or profits; and that they are authorities pointedly supporting the case of the appellants, if *Edward Dorsey's* will did operate on the profits.

The intention of the testator, collected from the *whole will*, is to controul and govern its exposition. The intention is not to be collected from extraneous matter, or the view of particular devises. The object of the testator being ascertained, the intention must be applied to give the object full effect, if consistent with the rules of law.

*Edward Dorsey*, by his will, intended to dispose of *all his estate*. He considered that *all* his property was specifically devised, and there was no undisposed residuum, of existing stock, or *interest* or *profits*, from his *real* or *personal estate*.

The first object of his bounty were his children; he evidently intended all his estate, and all the profits of it, to go to them, if they should attain the age of 21. He considered the estate, and the *increase* and profits of *it*, as disposed of together; he intended that the real and personal estate at the Furnace and the Patuxent Quarter should pass together to the testator of the appellants. In this disposition there is nothing opposed to the rules of law. There is not one, among the most inflexible legal rules, which requires that *that* intention sould be frustrated.

What are the testator's words? for they are not candidly quoted, or fairly applied, by the appellee's counsel.

After devising that portion of his estate to his daughters, which he intended for them, and providing for the event of the birth of a son, and settling the limitations which he designed to give effect to in case of a death, he provides, "if either of my children should die before she " or he arrives at the age of 21 years, or is married, " then my will and desire is, that such part of my per- " sonal estate as is by this my will given to such child, " shall, *together with the profits thereof*, if any made, &c. " go to the survivor." The same real and personal estate in Anne-Arundel county, *thus* given to his children, is limited over to his brother *Caleb* in case of their deaths under age and without issue. It is given by the words *all my share of the personal stock that I have in iron works*, &c.

Can there be a rational doubt, that by the words share of *personal stock*, he meant that his brother *Caleb* should have the same interest as his children, if they had lived,

would have had, when we consider the other devises in the will?

The whole property was placed under the care of his executor, whom he constituted the guardian and *trustee* of his children.

That he contemplated an increase of his *personal stock* by *profits*, is apparent, because he devised it over on certain events to his children, &c. That he contemplated the increase of his personal stock at the Furnace, and that the words *personal stock* in the devise over to his brother *Caleb*, were meant to comprehend not only all *the stock* which he should die possessed of, but also additions which should be made by increase or *profits*, is perfectly clear, *if the testator's own exposition of the words of his will are to be regarded;* for, he directs his executor " to advance and pay as much money as shall be " necessary for carrying on, and completing *or enlarging* " his share of iron works, be it for buying lands, ne- " groes, white servants, or any other *enlargement* of the " said *stock.*" It is therefore incontestible, that in one devise, embracing the property in question, he used the term *stock* as sufficiently comprehensive to include the *original* as well as *additional personal estate*. He limits and specially, 1st. directs an application of the *profits*, to *support his children*—2dly to increase his share of iron works —and 3dly if there should be a surplus he directs it to be put out at interest. He has therefore disposed of all *profits*. If the *profits* had been invested, as directed in the enlargement of his " stock" in iron works, it would have gone to *Caleb Dorsey*, because he has expressly devised all his personal stock in iron works to him. If it was not laid out as directed, there is no principle of law or equity clearer, than that he who is entitled to the stock in which money is directed to be invested, and which is not invested, shall have the money itself; this will not be contented; so that, in either case, *Caleb Dorsey* was entitled to these profits under his brother's will.

That it was *Edward Dorsey's* intention that *Caleb* should be so entitled, I have proved by his own exposition of the *extent* of the words " personal stock" used by him.

It will not be denied by the appellee's counsel that the *intermediate* profits might lawfully be devised by *Edward Dorsey*—nor can he pretend the general rule of law stated by him to be applicable here, if *Edward Dorsey's* will embraced them.

That his will does embrace them appears to me beyond all doubt: For

1st. All his personal as well as real estate, during the minority of his children, was placed under the direction of his executor as guardian and *trustee*.

JUNE 1798.

C. Dorsey
vs.
E. Dorsey.

2dly. The children were to be educated and supported by him *out of the profits.*

3dly. The profits after support, &c. of the children, were to be applied to the *enlargement of his stock.*

4thly. That *stock* so raised, or directed to be raised, from the *profits*, is devised over, on an event, which has happened, to *Caleb Dorsey.*

If the law is correctly stated, the appellants must succeed in a *total reversal* of the decree; but even admitting, that the appellee has a right to an account, (which we strongly deny,) we humbly insist that she is not entitled to any interest, but if to any, at most only from the time of the account *reported and confirmed.* Any examination of this part of the decree, it is alleged by the appellee's counsel, cannot now be made, as no exceptions were taken in the court below to the auditor's report.

Strong indeed must be the authorities and the reasoning to induce a court to listen to an objection which stops at the very threshold of the court the inquiries of justice! Dreadful indeed must be the situation of suitors, miserable the situation of judges, if the law which erects tribunals of revision, shall tie up their hands, and exhibit them only as a mockery of justice. I can scarcely stop to answer such an objection.

This court, in its appellate jurisdiction, has, and must always necessarily possess, all the powers of decreeing on every matter contained *in the record* before them—of decreeing on the broad principles of equity, governed by the rules of justice in their application to the case—without restriction to forms incompatible with honesty.

If authorities are wanting, see the case *Brown's P. C.* 59, 202; and the decree in *Pennington & Griffith.*

It is admitted by the appellee's counsel, that " *Caleb " Dorsey,* in this case, was *manager and trustee,* or bai-- " *liff,* for *E. Dorsey's* child," in his argument to establish the *right;* and, if he was a *trustee* of the property for *one* purpose, he must be to *every* purpose relative to the *same* property. It is *certainly true* that if the appellee has a *right* at all it is against *Caleb Dorsey* as trustee.

I shall endeavour to satisfy the court, 1st. That there had been no default in *Caleb Dorsey*, or his executors, and that without default trustees are not chargeable *with interest;* and, 2d. That by the rules of law and equity *no interest is chargeable* in this case, before the time of the auditor's report confirmed.

1st. *Caleb Dorsey,* in his life-time, was only responsible, if responsible at all, *as a trustee,* as is admitted by the appellee's counsel. In his life-time the contest, which is yet depending, had arisen. The representatives of *Edward Dorsey* claimed an account of stock and profits from

him as a trustee. He denied their right to such account, alleging that the property belonged to him under his brother's will. It was therefore impossible that the case could be settled in any other mode than by a judicial decision. The opinions of the most eminent counsel of that day supported the claim of *Caleb.* If it was proper or justifiable in his life, it was still more so in his executors, the appellants; who could with no kind of propriety have recognized a claim which their testator controverted. It was the *duty of their office* to pursue the course they have taken.— Whether *Caleb Dorsey, in his life-time,* shall be considered a *trustee* for *Edward Dorsey's* children, and his executors as standing in his shoes, or whether those executors are considered as the trustees of *Caleb Dorsey's* children, it was alike proper that the case should be brought before the court of chancery. They had no power to *compromise;* they had no right to abandon the pretensions of their *cestui que trusts;* the court of chancery has the exclusive jurisdiction over trustees. By the very form of its constitution and practice, much delay must arise in bringing any case, and more especially cases where parties are numerous, and the sum important, if deaths intervene, to decision. Such was the present case; and in addition to the prolongation of time from various deaths, and bills of revivor, &c. the war which suspended the functions of the judicial power created great additional delay. In the defendants in chancery, (the appellants,) there has therefore been no delay, but such as resulted from the act of Providence, and unavoidable national conflicts. Shall these events, neither in their power to controul or avert, be attributed to them as *defaulting* acts, subjecting them to punishment by inflicting the payment of interest? Surely not. It is only such acts as are *designed* for delay, or contumaciously resist the decrees of justice, as can be considered *defaults* subjecting to interest. "Who shall decide, when doctors disagree?" If so much contrariety of opinion has existed in this case from the year 1767 to this period, yet unreconcil.d, among counsel of the first eminence, and which interposed obstacles that could only be removed by a legal decision, shall the defendants be charged with interest for placing the contest in the only proper way to determination?

That such a course was their duty cannot be well denied; it is the course directed by chancery to its immediate agents.

If a sale be made under the direction of the court, and opinions of counsel are given that the title *is doubtful,* it will not compel the purchaser to complete his purchase— 2 *P. Wms.* 199. How much stronger is the case before the court than that! *There* the parties are all before the court;

the doubt may be removed, and the title placed on as stable a foundation as judicial decision could fix it. *Here,* an endless train of relations, &c. all interested in the distribution of *Caleb Dorsey's estate,* and none of them before the court; and where endless litigation would in all probability have been the consequence of an acquiescence in the appellee's claim. And shall such a case be selected as one to be punished by interest?

Those delays which are the consequence of *jurisdiction,* are not the grounds for charging interest—2 *Vesey, junior,* 169, (decided in 1795.) Nor, unless there be *gross* and *wilful misconduct* subsequent to a decree, or order for payment, shall interest be charged—*ibm.* But it is chargeable *only* for such *misconduct.* As in the case put by Lord *Hardwicke,* 2 *Vesey,* 589, of writs of error brought to *delay execution;* and also as in the case 2 *Vesey, junior,* 36, where a *trustee disobeyed an order* to pay money into court.

2dly. By the rules of law and equity *no interest* is chargeable in this case before the auditor's report confirmed.

*Interest* is *generally* due on *liquidated debts* from the time payment is delayed; but it is within the *discretion* of the court, who on circumstances may abate, or discharge interest *due*—*Ca. Ch.* 106. And interest is only given by way of *damages ratione detentionis debiti;* but not where damages only are recovered, for interest is not recovered *occasione damnorum*—2 *Salk.* 623. 14 *Vin. Ab.* 457, tit. *Interest, (C) pl.* 3.

The claim of the appellee is not for a *debt,* but is grounded on a *breach of trust.*

*Caleb Dorsey,* as manager, was only to superintend the *making* of *pig iron,* &c. He was not *authorised* or *bound* to *sell it.* What are the words of the articles of copartnership—"all pig iron to be annually carried to Elk-Ridge Landing and *there* divided." If *Caleb Dorsey,* in violation of the articles sold pig iron, or sold it under a mistaken opinion that it was his own, the right of the appellee was not against him as for a *debt,* but for *damages* equivalent to the value of the property *improperly disposed of;* for a *debt,* technically speaking, can only spring from *contract;* and although there may exist a well founded claim against a trustee *quasi ex contractu,* yet it sounds in *damages,* and no interest, according to the cases above cited from *Salkeld* and *Viner,* is demandable for *detention of damages.*

But even admitting that *Caleb Dorsey* was to be considered a debtor to his brother's representatives, it was for an *unliquidated* sum; a *simple contract debt;* and which bears no interest till ascertained, and the auditor's report confirmed; for this see 1 *P. Wms.* 376, 367. 1 *Chy.*

*Rep.* 27. 1 *P. Wms.* 480.    *Forrest* 2, 3. 2 *P. Wms.* 163.   JUNE 1798.
2 *Vesey, junior* 163.

And further, considering *Caleb Dorsey* as a *debtor*, it      C. Dorsey
could only be from the time he actually received the      vs
amount of sales of the pig iron. The appellee has neither    E. Dorsey.
established the *time* nor the *amount*; but the auditor has
charged interest on the *whole*, as if actually received in
1766, and upon an *estimated* value, without allowing any
expenses for haling, &c. which are legally and justly
due and chargeable.

There is no proof of the *time* or *amount of actual
sales*, or the *receipt* of the amount by *Caleb Dorsey*,
which is a strong additional reason in support of the ap-
plicability of the authorities against the allowance of in-
terest till the auditor's report, to wit, from 1795. In ad-
dition also to the well founded reasons for contesting the
appellee's claim, and the other authorities quoted, it is to
be remarked that the appellants are even charged *with
interest during the war.* During so great and national
a calamity interest is always suspended even in favour of
a *debtor* against a creditor.—*Vin. tit. Interest, ( C. )*

Upon the whole, it appears, that even supposing the
appellee's right to an account, interest is not chargeable.

1st. Because the *delay* was without fault in the appel-
lants, and the consequence of jurisdiction.

2dly. Because it was the duty of the appellants to
bring the case to a judicial end, and therefore *as trustees*
no interest runs against them.

3dly. Because interest is not due for an unliquidated
sum before ascertained, nor demandable for *detention of
damages.*

4thly. Because *Caleb Dorsey* was not liable as a debtor,
but as a trustee, and that only for what was *actually re-
ceived*, and without interest.

We therefore humbly expect a reversal of the decree,
and at all events that a new account, in which proper
credits may be had, may be directed to be stated, or all
interest struck off.

*Ridgely*, for the appellee, [with leave of the court.] The
appellants' counsel pretend they are aggrieved by the de-
cree of the chancellor, and that it is erroneous in sundry
particulars.

But as the appellants' counsel themselves differed wide-
ly in that respect, the one contending *that the decree is
erroneous in toto*, the other admitting that the decree
hath passed upon proper grounds, but that the same is
erroneous as to *interest*, for a small portion of *time*, and is
incorrect with regard to one or two other *trifling items*.

I will therefore confine my remarks in the first place,

JUNE 1798.

C. Dorsey
vs.
E. Dossey.

in answer to the counsel who spoke last, who has hazarded assertions and positions which have long since been overruled and determined in this cause.

But I must first correct his statement as to the manner in which this cause was conducted in the court of chancery. He has observed, that the decree of the chancellor passed without *argument,* as a matter of course, although all the questions *of equity* were expressly reserved, and therefore that all the questions in this case are to be considered as if never having been decided by the chancellor, whose opinion, he admits, ought to have deserved weight and credit!

The real truth is, that the questions of *survivorship,* and whether the profits of the furnace passed, under *E. Dorsey's* will, to *C. Dorsey,* were *fully investigated,* and argued, when the plea of *C. Dorsey* was overruled, and he was ordered to answer the bill. The same questions were agitated when the chancellor passed his decree in this case, but they were then considered by the defendants' counsel, as having been *previously* decided, on the plea being overruled, and as not being supportable upon any principle of equity; and the defence on *these grounds,* was then totally abandoned.

But new counsel often discover new points, which have escaped the penetration of their predecessors. On this ground, I account for the observations of the counsel who spoke last.

The appellants' counsel contends, that survivorship takes place, in every kind of *chattel-interest,* except in the case of *merchants,* thereby confining the exception to *merchants* alone; but if we advert to the most celebrated decisions in Great Britain, we shall find it a rule, never deviated from in a *court of equity,* that when two persons engage in a *joint undertaking* for profit or loss, whether for selling merchandize, or for any other business, there shall be no survivorship.—1 *Eq. Ab.* 370. 3 *Bac. Ab.* 192–3.

In 3 *P. Wms.* 159, it is laid down by the chancellor, as a position not to be controverted in equity, that any undertaking *upon the hazard of profit or loss,* was in the nature of merchandizing, where the *jus accrescendi is never allowed.*

Will the counsel for the appellants undertake to say, that a *farm stocked jointly,* carried on at *joint expense,* and the *profits equally* divided, is not an *undertaking upon hazard* of either *losing* or *gaining.*

Great fault is found with the law in 1 *Vern.* 217, for its obscurity; but on an attentive perusal it appears to be as accurately reported, as any case in the books, and we find it corroborated and referred to, in 3 *Bac. Ab.* 192–3, where if two take a lease of a farm, the lease shall survive; but the *stock on the farm, though occupied jointly, shall not survive.* Is not this case *expressly in point;* and I defy the gentle-

men to produce a single authority to contravert the doctrine, or to shew that this case hath ever been impeached.

Nay, *C. Dorsey* himself, divided and appraised the stock on the farm on the death of *E. Dorsey* in 1760, and suffered his daughter to enjoy the profits till her death in 1766, without claiming any right thereto by *survivorship:* If he was entitled to the property as *survivor,* he ought to have asserted his claim in 1760, when the event happened.

Let us now attend to the second point: Whether the profits of Elk-Ridge Furnace, &c. passed under the will of *E. Dorsey* to his brother? The cases in 2 *P. Wms.* 419, and 1 *Bro. Ca. Chy.* 82, are admitted to be good law; but, it is contended, that they apply only to the case where the testator has been silent as to the *profits;* if *profits* can be considered, as *stock,* or *interest* as *principal,* then the objection may have the appearance of weight. Let us now advert to the will, and see, whether on taking a collective view of it, it could possibly have been the intention of the testator that all the *profits* of his one third of the Elk-Ridge Furnace should be converted *into stock* every year, for *the joint benefit* of the company, and that in case of his death, it should go over to *C. Dorsey,* under the words, *all my share of the personal stock, that I have in iron works.*

What were the articles of agreement as stated by the defendant's answer? *That all pig iron should be annually carried to a convenient landing,* and *then divided into three parts.*

Who, by *E. Dorsey's* will, was to take charge of his daughter's one third? His executor and trustee. What was the executor to do with it? To lend the proceeds out *on interest,* for *the child's benefit,* if more than sufficient to maintain his children, and answer the other disbursements, directed by the will. What could possibly be meant by *personal stock,* but the negroes, teams, &c. necessary and used for carrying on iron works? Not *the profits.* If the testator had intended the profits of the iron works to go over to his brother *C. Dorsey,* he certainly would have said so, for we see that he has limited over the *profits of* his personal estate.

If *Caleb Dorsey* was entitled to the profits *of the* furnace, as *personal stock,* how happened it that he delivered to the guardian of *E. Dorsey's* child, from the year 1760 to 1766, the quantity of 694 tons of iron, as will appear by one of the exhibits? Or how happens it, that he hath never called on the administratrix of the daughter to *account for and repay* this quantity of pig iron if he was entitled to it, as *personal stock?* For surely, if the balance of profits, *undelivered,* was his, under the will, the part

*delivered* must have passed also, under the same limitation over.

But if we attend to *E. Dorsey's* will we shall find, that in case of the death of his surviving child, he gives as follows: "That then all the personal estate, that shall by "this my will, belong to such surviving child, shall be "equally divided among" sundry of his relations, (not including *Caleb.*)

And if we take a view of the account exhibited in the cause, furnished by the appellants, we shall find, that sums were annually paid, by the guardian of the child, for *enlargement* of stock, which *C. Dorsey* has pocketted; 101*l.* 4*s.* 9*d.* sterling, and upward of 500*l.* current money, in the year 1765 only.

The appellee's counsel is made to say, what they never thought of saying, that as no exceptions were filed to the auditor's report, the justice or propriety of it cannot now be called in question by this court. I wish the whole case to come before the court, and we shall, on examination, find that the auditor has not allowed us *as much interest* as we are justly entitled to. But before I go into an investigation of particulars, let us examine the general principle which influences courts of equity *in decreeing interest.* That I have said nothing about the interest charged in this decree, in my former argument, is true, because I apprehended, that if the *principal* sum was decreed to be justly due, the allowance of *interest* was a matter of course, as a compensation for this long and unjust detention and delay.

The appellants' counsel styles *C. Dorsey* a trustee, and then he lays down two positions.

1. That there has been no *default* in *C. Dorsey,* or *his executors,* and without default *trustees are not chargeable with interest.*

Let us examine the facts—*C. Dorsey* got possession of his property, (the pig iron,) occasionally from 1760 to 1766, and converts it to his own use. When called upon in this court, in January 1767, he refuses to answer, but pleads in bar to a discovery. After this plea is decided against him, he still obstinately refuses to answer; stands out all process of contempt, and dies in 1772. A bill of provisor is filed in 1773, and the executors delay putting in an answer till 1790. And in this answer they do not even pretend to allege, *that they have always kept money by them,* lying dead and *useless,* to answer this demand, but on the contrary, they expressly admit, that they have deposited part of the testator's assets, *on interest,* in the Loan Office, which *draws an interest* of 6 per cent; and *the residue they divided among the* legatees of *Caleb Dorsey.* Yes, the appellants themselves, (being the legatees,)

have divided the personal assets of *C. Dorsey*, being upwards of 10,000*l.* and have had the use and enjoyment of them ever since the year 1772, and now pretend that it is *contrary to all rule of equity* for this court to affirm a decree *for them to pay interest.*

JUNE 1798.

C. Dorsey
vs.
E. Dorsey.

Let me ask the appellants whether this claim was kept dormant and concealed from them till they had paid away and distributed all the assets, or had they not full notice of it before they distributed and *divided C. Dorsey's* estate? Was not the present suit depending against them when they made a voluntary distribution, with full notice of our demand?

Let us now attend to the decisions of the courts on this point. *Finch* 254. 1 *Eq. Ab.* 125, *pl.* 4.—On a bill brought to call a trustee to account, it was held, that if he, by his answer, *submits readily to it,* he *shall pay interest for the balance,* from the time of the account *liquidated,* and *no* costs, if he has not *misbehaved himself,* that is, if he has acted honestly and *fairly;* but if he delays the matter for 20 years, (as in this case,) he shall pay interest *from the time of the bill* filed. 3 *Bro. Chy.* 434—Executor keeping money of the testator's in his hands, liable to *interest* and costs.

In this case, the counsel for the executor abandoned the question of interest, and contended only *about the costs.*

But if we examine the case in 6 *Bro. P. Cases,* 319, it is *exactly in point* to establish the propriety of the interest charged in the present suit; for in this case, it was decreed, that an executor should be chargeable with *interest* for the annual balance in his hands, though *retained during the pendency of contested suits.* If we advert to the exhibits filed in this cause, we find that *C. Dorsey* rendered an account of the pig iron on the 15th October 1766, whereby it appears *the balance* was at that time *in his hands,* as stated by the auditor.

In 1 *Vern.* 197—It was held by the chancellor to be reasonable, that executors, in all cases, *should answer interest,* where they *had used the money,* or received any interest for it.—1 *Eq. Ab.* 238. *pl.* 23.

In 2 *Salk.* 415.—Interest chargeable from the time of the demand.

If the doctrine contended for by the appellants' counsel, is admissible, what would be the consequence? Many executors would postpone paying creditors, by all the evasions and delays that ingenious counsel could invent; because, by so conducting themselves, they would reap all the benefit and *profits arising from* the use of the testator's effects, to the injury of creditors.

Such doctrine would be an encouragement to *fraud.* Nay, these very appellants, at the last October general

court, recovered 26 years interest for bar and pig iron, shipped by *C. Dorsey*, to *West & Hobson*, and which had not been accounted for.

It is a golden rule to do unto others as you would they should do unto you.

We only claim from the appellants what they have recovered, *by judicial* decision from others; that is, compensation for the detention and use of property, which they *have wrongfully* withheld, and converted *to their own benefit;* and in equity, as well as law, it is invariably established, as an unerring principle, *that no man shall take advantage of his own wrong.*

The appellants' counsel has asserted, that there has been no delay, or *default,* in the appellants, in bringing this claim to issue, but what resulted from Providence, or unavoidable national conflicts; and also that there was great variety of opinion, among counsel of the first eminence, on the questions arising in this suit.

Let me ask, whether it was not in the power of *C. Dorsey*, in his life-time, from 1766 to 1772, to have brought this case to final issue, if he had been so disposed and wished an end to the suit? But instead of that, he evades even answering the bill for the space of six years, and dies leaving the suit no farther advanced than when first commenced. In 1773 a bill of revivor is filed, which the executors, after repeated attachments of contempt, delayed answering till 1790, and have procrastinated a decision ever since. If this is not *neglect* and *defaulting,* words and actions must lose their force and meaning.

But it is said, that this is a very doubtful case, and a great variety of opinions have arisen among the most eminent counsel. Where this information was obtained I am at a loss to conjecture; but if there had been, could not *C. Dorsey,* or his executors, after the points were decided in 1767, on the plea filed by *C. Dorsey,* have then acquiesced in the chancellor's opinion and settled the debt?

The appellants' counsel contends that no interest is demandable but for a debt, and that no *claim is a debt unless by specialty;* that this claim being grounded on a *breach of trust,* and sounding *only in damages, no interest is demandable on it.* " Dreadful, indeed, must be the situation of suitors---miserable the tribunals of justice," to borrow the gentleman's own expressions, if this doctrine is to prevail, and if a man can come into *a court of conscience,* and plead that he owes *no debt that carries interest,* because he *has not signed and sealed a bond;* but that he *has committed a breach of trust,* by which he has got *thousands* of his employers in his possession, *who confided* in him, therefore *is not liable to interest,* because he did not fix his hand and seal to the contract.

Is no claim, or demand, to carry interest in a court of equity but debts or specialty? Does not equity put all claims on an equal footing, and make no distinction between those, with or without seal, when there appears a conscientious obligation to discharge them?

If the doctrine of the appellants' counsel was to prevail, so far as to reverse this decree, on the ground of *interest being charged*, there would be a total stop put to the settlement of all deceased person's estates; for whenever executors are informed, that this court *will exonerate them from interest* for just claims due from their testators, as long as they can withhold and convert the assets to their own use, they will use all possible means to procrastinate payment. I say, when they are informed, by a solemn decision of this court, that executors may lawfully, under pretence of litigation, withhold assets from creditors and legatees as long as the tedious delays of the law will admit; and if the present decree is reversed, such would be the result of the decision. What would be the consequence? nothing less than ruin to creditors of deceased persons.

The appellants' counsel contends, that interest should not be chargeable during the war. Has our legislature stopt its progress during that period? Do not decisions take place daily in our courts of interest being recovered during the late war? And have not the appellants, themselves, furnished a striking example, during the last October general court, by recovering 26 *years* interest on an unliquidated claim for pig iron shipped prior to the late revolutionary war?

It is also contended by the appellants' counsel that the decree is erroneous, because two or three years interest is charged on the pig iron before it could have been sold. If we advert to the exhibits, we shall find that *Edward Dorsey's* one third of the pig iron made in 1766, amounted to 119 1-3 tons; so that *C. Dorsey* must have had, in his hands and possession, of the preceding years, 178 *tons*, on which no interest is charged, till 15th October 1766; so that instead of being over *charged* with interest, he ought to have paid much more than as stated by the auditor.

The second objection made by the counsel to this decree is, that no allowance is made for the carriage of the pig iron to the landing; neither ought there to be, because the pig iron was carried to the landing by the company's teams, before the death of the child of *E. Dorsey;* 178 tons of it must have been carried to the landing place during the years 1760 to 1765, the remaining 119 tons between July 1766, when the last blast was made, and 15th October, when the account was rendered; besides, we have no proof whatever that the hire of the carriage

of pig iron was paid by *C. Dorsey* in his *private capacity*; if it was paid at all, it must have been charged to *general expenses against the company*.

But fault is also found with the exchange being rated at 66 2-3 to reduce it into currency. To this objection I answer, that it is the *legal* exchange, and this court knows no other; besides, have we any proof of the exchange being from 57 1-2 to 65? No. Upon the same principle we might find fault with the price affixed to pig iron, the current price being at this time 10*l.* sterling per ton, and we are only allowed at the rate of 5*l.* sterling.

Upon the whole, I think it must appear evident to the satisfaction of the court, that this decree is equitable and just; that the appellee is only allowed the amount of her claim, according to the value of the property at the time it was converted by *C. Dorsey*, most wrongfully, to his own use; and compensation for the long detention—a detention evidently created by the appellants' themselves, for the sole purpose of *using the property, and enjoying* the profits, for so many years.

*S. Johnston. Key* and *Winchester*, for appellants.

*Martin*, (Attorney General,) *Cooke* and *Ridgely*, for appellee.

THE COURT OF APPEALS *affirmed* the decree of the Court of Chancery, with costs.

———o———

## COURT OF APPEALS, JUNE TERM, 1798.

### T. T. SIMMONS *vs.* HILL, *et al.*

APPEAL from a decree of the court of chancery dismissing the bill of complaint.

The bill states, that *Charles Drury*, deceased, being seised and possessed of a considerable real and personal estate, on the 7th of August 1740, duly made and executed his will in writing, whereby, among other things, he devised to his daughter, *Sarah Drury*, and the heirs of her body lawfully begotten forever, all the land which he held between the main road, &c. called *Drury's Adventure*, &c. That soon after, in the same year, the said *Sarah Drury* intermarried with *Abraham Simmons*, by whom she had two children, viz. a daughter named *Betheridge*, and a son named *Abraham*, who was the father of the complainant. That the said *Abraham*, the grandfather of the complainant, died in the year 1745, having first made his will in writing, whereby, with the consent of his wife *Sarah*, (devisee of the said *Charles Drury*,) he devised the land aforesaid to his two children *Betheridge* and